Good afternoon. Deputy Attorney General Karl Tripp on behalf of my panel of respondents. I'd like to take five minutes and reserve five minutes for reply. Okay. Can you see the clock? There's a clock by the left. I guess you can't see it. Not movable for... That's okay. Well, we'll try to sort of... Here. Can you see this? I think if I undo the cord under here, I can lift this. Is that right? Nope. I still can't. Now I've destroyed court property. Give you some fair warning. How's that? That'd be fine. That'd be fine, Your Honor. Thank you. Thank you. That's fine. Let's just go on. Okay. May it please the court. Deputy Attorney General Karl Tripp on behalf of respondent appellant. It's come to my attention that opposing counsel intends to bring before this court some exhibits that were before the jury at trial. And I submit that it is inappropriate for two reasons to do this. The issue before this court is whether the federal district court applied the correct standard of review. We're not reviewing the state appellate court's decision, and those exhibits were not before the federal district court when it made its determination. But secondly, and more importantly, this is an attempt to get this court to reevaluate the evidence, to make determinations of credibility, and to do those functions which are only reserved for the trial court or for the jury at trial. And that's to weigh the evidence. So I would submit that it's inappropriate based on the standard of review under 2254 D1 for this court to consider those exhibits. The issue before this court is whether the state appellate court applied the correct standard of review under Jackson v. Virginia, and whether that determination was objectively unreasonable. There's a couple of legal principles that are important to keep in mind when reviewing that determination. As this court has found that there's two layers of deference that apply when reviewing a state court decision based on sufficiency of the evidence. This court has acknowledged, as a U.S. Supreme Court, it's not a question of whether the state appellate court decision was erroneous or incorrect, or even contrary to determination this court would have made, but whether it was objectively unreasonable. And this court has also acknowledged that the prosecution need not affirmatively rule out every hypothesis except that of guilt, and that the jury's credibility determinations are entitled to near total deference under Jackson, and finally under Jackson itself. That court stated that a federal court faced with historical facts supporting conflicting inferences must presume even if it's not affirmatively in the record. Did the trial in fact resolve those conflicts in favor of the prosecution, and must defer to that resolution? The facts which support the jury's verdict are these. First, as uncontradicted, Coral arrived at the Madriaga home that morning healthy and aware. She had breakfast with her parents, and she played with her mother. Nadine Madriaga asked Madriaga at approximately 12-15 to assume feeding Coral, because she needed to go upstairs and get dressed so that she could go and pick up their other child, who was not present. At this time, Madriaga was with Coral feeding her their two-year-old and their four-year-old. Coral was standing on Madriaga's knee while he fed her some noodles. She toddled away from him. She was unable to walk at that point. She toddled away from him, she flipped over a bowl of noodles, and she created a mess. It is also uncontradicted that at 12-23 p.m. that day, Nadine Madriaga made a 911 phone call. At that point, Coral was in distress. She had already suffered the injuries. It is also uncontradicted that Coral died from being violently shaken. Shaken baby syndrome is what it is known as. She suffered massive subdural hematomas, causing swelling in the brain, and eventually coma and death. Madriaga made statements to both. The Coral was taken to points at the hospital to police detectives. At approximately 10.30 p.m., a recorded statement was taken from Madriaga. This statement was played for the jury, and the jury was able to hear Madriaga's tone and manner during the interview. During that interview, Madriaga could not explain what happened. At one point, when one of the detectives asked him if it was possible that Nadine had committed the offense, he said, and I'm quoting from the record, No, I have no idea. She was changing upstairs. I was the only one there. She couldn't even have done it. When they were not sure if she said could or could not have, Madriaga stated she could not have done it. When repeating, she couldn't have. The jury could have taken this and made a credibility determination that Madriaga knew that Nadine had not committed the offense. Madriaga was in the care of the jury. So the jury would have said, yes, she's telling the truth. Nadine couldn't have done it, and therefore inferred he must be saying, I did it. They could have made it. Is that the chain of reasoning? The chain of reasoning is that Madriaga was the last one in the care and custody of Coral, and when he stated to the jury that Nadine did not do it, that they could have believed him and rejected the other statements that he made. So the district court made the statement, no evidence shows that Nadine could not have done it or did not do it. Your position is that that interview is such evidence. Exactly, Your Honor. And didn't he also say, I think it was even to the 4-year-old, the baby fell, didn't she? Exactly, Your Honor. That points to the fact that there were some contradictions in this claim. First of all, he told Susan Blanchard and other people at the hospital that she didn't fall. Later on, at 10.30 that night when he was giving the interview, he said she must have fallen. I think she fell. So he's making contradictory statements, and by 10.30 at night, the figure is being pointed at him. And so he's making these furtive statements. So the jury, he is capable of making credibility determinations. Well, let's say he, in fact, was lying about whether the baby fell or not. How would that help? Let's say, in fact, he lied about it, that he lied. Sure. He tried to say the baby fell, and it didn't fall. How does that help the prosecution's case? It establishes, along with the medical testimony, that she was violently shaken to death, that he was making up a story that he was trying to cover for the fact that he had shaken her. Now, this phenomenon of shaking baby syndrome only takes a few minutes, or a few seconds, actually, to occur. There was expert testimony establishing that it only takes a few seconds of violently shaking to cause these injuries. And so, therefore, it was not objectively reasonable, and it was not irrational, for the jury to believe that Mabryaga inflicted those injuries while Coral was in his care. This precipitated by the fact that she spilled the noodles and created the mess. Your Honor, I'd like to reserve the remaining amount of my time for replies, since I have 45 minutes. Okay. Your Honor. Your Honors, Davina Chan on behalf of Isagani Mabryaga. Mr. Mabryaga is present. Your Honors, Mr. Mabryaga served eight years of a 15-to-life sentence for a crime he did not commit. This case is about the presumption of innocence. It's about what kind of proof makes out proof beyond a reasonable doubt. It's about what kind of proof is enough to take away a man's liberty. And I would submit, Your Honors, that it wasn't even close here. From the evidence at Mr. Mabryaga's trial, the jury could reasonably have concluded that either Mr. Mabryaga or his wife, Nadine, committed this crime. But it could not have reasonably concluded that Mr. Mabryaga did. The respondent argues that the jury could have weighed the conflicting evidence. It had to have been one of the two of them. Excuse me? It had to have been. The baby was healthy when it was delivered there. And there was no one else nearby that could have done this other than Mr. Mabryaga and his wife. Yes, Your Honor. Based on the evidence that came in at trial, it had to have been on one of them. The reason why I say could reasonably have concluded is because there's still an outstanding issue in this case, and that's on ineffective assistance of counsel for failure to consult with an expert on shaken baby syndrome as to whether either of these individuals committed this crime. But you're right. Based on the evidence that did come in before the jury, it had to be one or the other of them. But there was no evidence from which it's a... You slipped into something there about inadequacy of counsel. There's another claim in this case. It has not yet been resolved by the magistrate court or the district court. The court resolved this issue because it was dispositive. So there's another issue in the case. It just has not yet been resolved. I haven't experienced this piecemeal approach. Your Honor, the magistrate block was not sure whether he could proceed in this manner. The parties agreed that he could because if it was granted on insufficiency of the evidence, then there could be no retrial. So there would have been no reason to reach the ineffective assistance of counsel claim. But is there... I mean, I'm having a little trouble in terms of the appellate posture in that case. So let's just say that we were to disagree with your position and reverse the district court. Would you then say you still have remaining in the district court pending claims for ineffective assistance of counsel? Yes, Your Honor. Why isn't that waived? It's not waived because the court specifically said that he needed not resolve it at this juncture. Maybe we don't have jurisdiction if the district court hasn't determined all pending claims. Why do we have jurisdiction? Yes, Your Honor, because the district court's resolution of this claim was a final judgment. There are cases, and I don't have them because I didn't realize this issue would come up. How can it be a final judgment if you're just taking half of it? There are cases in which the issues before the district court were issues of guilt and issues of sentencing. You know, you shouldn't be wasting your time. You should just concede we don't have jurisdiction and then your client stays free. You don't really care whether we have jurisdiction or not, do you? If we don't have jurisdiction to rule, then the state loses and your client goes home. I really, really believe that this court should affirm. So I suppose if this court doesn't have jurisdiction to rule, then I suppose that we're done. I wanted to address Judge McEwen's… I mean, I'm not ready to pass this off so quickly because it is an important question. Maybe, you know, I missed it. I have to confess in reading. Why don't you just concede we don't have jurisdiction? You don't care. I suppose that's true. If this court doesn't have jurisdiction, then I don't care. Right, and then you're back in the district court? No. Are you done? You're done. We're done. You're done. I mean, I can argue whatever you want, but it seems to me this is not something that's in your client's interest to argue that we have jurisdiction. Okay. I think you're sort of spending your time arguing something that's against your client's interest. If I could move to if this court does have jurisdiction, it should affirm. And Judge McEwen seemed to indicate that she believed that the tape was evidence that showed that Nadine Madriaga did not commit this crime, and I would submit that that was absolutely not evidence that Nadine Madriaga did not commit this crime because what Mr. Madriaga said was, I don't know. Well, I didn't say anything. I asked the state a question based on his recitation, and then I asked how that dovetailed with the district courts finding that there isn't any evidence as to Mrs. Madriaga. So I have made no judgment one way or the other. No, you shouldn't infer from the question. Excuse me? You shouldn't infer from the question what we think, but why don't you go ahead and answer the question yourself and give us your view. My view is that Mr. Madriaga did not say that Nadine Madriaga could not have committed the crime. My view of it is that Mr. Madriaga said, I don't know, which would be perfectly consistent with the fact that he was not in the room. What exactly does he say? Did he ever say Nadine did not do it? He could not have known whether Nadine did or did not do it. I'm asking you if he said that, though. I don't believe he ever said Nadine didn't do it. I said she couldn't have done it. That's what he said? I believe he said something to the effect of, yeah, when they said she couldn't have done it. Isn't that sort of critical here? Because your position coming in is that you could reasonably conclude that either of them committed the crime. That was your opening gambit. And now the evidence that he may have given that's contrary to her seems pretty significant. So what is that? What did he say? What he said is I don't know. When pressed, he said she couldn't have done it. But what he said was I don't know. And when they asked him again at ER 26 whether she could have done it, he again said I don't know. The presumption of innocence in this case is that he was not in the room. If he was not in the room, he could not have known. Same with him suggesting that perhaps the baby had fallen. If he was not in the room and he did not know what happened, it is a natural thing for someone to ask, maybe the baby has fallen. In this particular case, there's undisputed evidence that you can say. Is that what he said, maybe the baby has fallen? Or did he say the baby fell, didn't she? What did he say? Well, the evidence was that he said you saw a coral fall, didn't she? But he didn't even call the baby coral. So it's clear that it was not a direct quote because he never would have said that. You have the transcript of his interview with the police detectives? Look at page 1. It's ER 24. It's got a little number at the bottom, ER 24. And then at the top, it has a number 0140-22. And if you look at the line, start reading at line 4. DH, I take it that is one of the policemen, right? Is it possible that Nadim may have done it? GM, that's your client. No, I have no idea she was changing upstairs. No, I have no idea she was changing upstairs. I was the only one there. She couldn't have even done it. DH, she could have. She could not have done. DH, she couldn't have. GM, yeah. Your Honor, at ER 26. Was that a correct quote was the question? Yes, it was, Your Honor. Thank you. At ER 26, they ask him again. Then would you say, Nadim, is it possible that she could have? And his answer is, I have no idea. He was not in the rooms, Your Honor. The undisputed evidence is that he gave numerous statements, and those statements were in the presence of Nadine Madriaga. Record sites 109, 116, 134, 278, and 295 indicate all the statements that Mr. Madriaga made in the presence of Nadine Madriaga. And each one of those statements shows. Would you just go back and state those record sites again? Sorry, they're 109. Thank you. 116, those are the statements he made to Mr. Jacinto. Those are ER numbers? Yes. 134, that's in the presence of Mrs. Jacinto. 278 and 295, statements made to Detective Armstrong in the presence of Mrs. Madriaga. And then at ER 194 and 195, these are statements made to Susan Blanchard. The record isn't that they were together at that time, but the record is that Ms. Blanchard does not actually distinguish between what Mr. Madriaga said and what Mrs. Madriaga said. And the evidence is... We're all focused on when Nadine Madriaga left the room, but the undisputed evidence is that Isigani Madriaga also left the room at some point, and that there was a period of time after he left the room before the baby was discovered. The undisputed evidence also is that it would have taken just seconds for this to have occurred. And so clearly with Ms. Madriaga in the house, she could have done it. But what counsel was referring to in terms of the exhibit that I wanted to show the court is the jury saw the layout of that house. And what the undisputed evidence is this is how the baby was discovered. Mr. Madriaga was in the garage. Mrs. Madriaga was upstairs. She comes down the stairs, apparently sees the baby in distress, and calls to Mr. Madriaga. He comes into the house, and they reach the baby at the same time. Now, it's kind of hard to picture without knowing what the house looked like, and so I was able to have someone go to Superior Court and take pictures of the exhibits. If the court wants to look at them, it may. If the court doesn't want to, I can try to describe to you what the house looked like. Well, just a minute. Was it in front of the district judge? It was in front of the jury. Was it in front of the Court of Appeals? It may have been. This is part of the record in this case. Was it before the district court? It was not before the district court because it was not lodged by respondents. Aren't we reviewing the district court's disposition? And the district court's decision was that without even seeing this, it believed that the evidence did not exclude the possibility that Nadine Madriaga committed this crime. But let me describe to you anyways because the layout of the house. Could you pass up the exhibits? I'd like to look at it so we can decide whether or not they're properly considered. Does the Board of Counsel have a set? Yes. So this is Exhibit 11C, which are the diagram of the house, Exhibit 10, which is the stairway, and then Exhibit 9, which is interior photos of the house. I want to focus on Exhibit 11, and then 9B helps you also to see the way this house looked. The stairway is right next to the family room. The garage door is down the hall further. The undisputed evidence is that Mr. Madriaga was in the garage and Mrs. Madriaga was upstairs. She comes down the stairs. She sees something's wrong with Coral, and she yells out to Mr. Madriaga. Mr. Madriaga returns from the garage, and they reach the family room at the same time. Even if we want to assume that Mr. Madriaga committed this crime, which we can't because there's a presumption of innocence, but even if we wanted to assume that Mr. Madriaga committed this crime, it does not explain Mrs. Madriaga's behavior because if you look at Exhibit 9C and 9B, what you see is there's one place from the stairway which would have been the first instance in which Mrs. Madriaga saw the baby. That's pretty much halfway down the stairs where there's an open railing situation. That's where she would have seen the baby in distress. And yet, the undisputed evidence in this case is she was still standing at that point when Mr. Madriaga returned from the garage, came down the hall, and into the family room. So to believe that Mrs. Madriaga stood there, she would either have to have called to Mr. Madriaga before she started down those stairs, or she would have had to stand there on the stairs after having seen what she says she saw, just stood there, not moved. And I would submit that this is not proof that Mrs. Madriaga committed this crime. Isn't this exactly what was submitted to the jury to decide? Yes, it was what was submitted to the jury to decide. Oh, the jury didn't draw that inference. The jury did not draw that inference. So... To adopt respondents... Does that make it implausible? I don't believe that it makes it implausible. I believe that the state chose someone to prosecute in this case. They chose Isigani Madriaga. But the same evidence that would come in against Mr. Madriaga, it showed that he did it or it showed that she did it, but didn't show that he did it over her doing it. The only way we can believe the respondent's theory of the case, that he must have shaken her before he went to the garage because the evidence was that she would have been lifeless after he shook her. I assume this is the same argument that was made to the trial jury by trial counsel. Actually, it wasn't. The trial counsel focused much more on reasonable doubt. And one can understand why that might happen in a case where a husband and wife are both possible suspects in a case. Yes, trial counsel said that Nadine Madriaga was in the home, but he didn't really focus on her. He just focused on reasonable doubt. What I'm saying in this case is all of the evidence is consistent with Nadine Madriaga having been able to commit this crime. All of it. Including Mr. Madriaga's statement that I don't know if she could have done it. I don't know. He doesn't know because he wasn't there. It can't be. The question is whether when he says on ER 24 he says she couldn't have done it, whether that is enough evidence to support a jury verdict. He says, well, I couldn't have done it. The reason he says he couldn't have done it, perhaps, is that he knows he did and that this is evidence coming out of his mouth that, well, you know, she couldn't have done it. I know she didn't do it. I know she didn't do it because I did. He does not say, I know she couldn't do it. What he says is, I have no idea. Well, on 26 he says that. On 24 he's more categorical. No, I have no idea she was changing upstairs. I guess this should be read, no, I have no idea she was changing upstairs. I was the only one there. She couldn't even have done it. She could have. She could not have done. She couldn't have. Yeah. He doesn't know. He's saying she couldn't have done it because he doesn't believe his wife can do what they're saying happened to this baby. At trial, is that an interpretation of the evidence? At trial, the jury. Why don't you answer my question first? That is an interpretation of the evidence. And an equally plausible interpretation, which the jury might have made, was he was saying, no, she didn't have done it. I would disagree because when they ask him again, he says, I have no idea. We know because we read through the trial transcript what it would have taken to have committed this crime, and we also know that it's likely that someone shook a baby to death. They didn't know all this at that time. They know that someone was being accused of shaking a baby to death. They didn't know for sure that someone shook a baby to death, but they knew someone was being accused of it. And he's saying, Mr. Madriaga and Mrs. Madriaga, and he's thinking she couldn't have done it. You said that the evidence was equal, but there wasn't any triggering event for her demonstrated in any form. There was a potential triggering event with the spilling of the food by the baby. Your Honor, in Juan H., which is a Ninth Circuit habeas case, there was motive evidence. It was a murder case. It was a gang murder case in which the defendant was in a trailer park with his brother. My question was there's no evidence of any triggering, potential triggering event in this case for her, but there was some for him. I would submit that only if we concede that the spilling of dry noodles could be a triggering event. Yes. That makes it different, doesn't it? I don't believe that it does. In the case of Juan H. v. Allen, the alleged motive evidence was that the defendant had made gang gestures at the victim, that the victim punched him in the face, that a few months later shots were shot into the defendant's family trailer, and the defendant may have believed that the victim did it. And the Ninth Circuit says this is not motive evidence. This is speculation. Similarly, in this case, this is an experienced father. He has three children. He insists that the couch is an old and soiled couch. To say that the fact that a baby may have spilled dry noodles on a soiled couch is a triggering event for somebody to murder a baby is like saying he missed the news that morning. But the expert testified to the jury that this maybe could have been, and that ordinary events can trigger anger. Isn't that true? It didn't really say ordinary events. Isn't that true? No, actually, it didn't really talk about ordinary events. That's what the expert said. Isn't it true? I don't believe so. I believe that the expert said generally it's a crying thing. The baby won't stop crying. But sometimes it's some kind of minor event. That's true. I would submit, Your Honor, to say that Mr. Madri... A crying event, they said an anger event, wasn't it? Yes, but there's no evidence of anger in this case. There's no evidence that Mr. Madriaga became angry because a girl spilled dry noodles on a dirty couch. There's absolutely no evidence of that. It's purely speculation. It's not even something that gives rise to an inference. Thank you. Counsel has made a very convincing closing argument. The time for closing arguments was at trial. She's brought out the exhibits. The time for exhibits is at trial. The jury considered these exhibits. That argument was not made at trial. But that doesn't matter. The question before this court and before this court is recognized is was there was the federal, was the state appellate court's determination that there was sufficient evidence objectively unreasonable? Well, you have his statement on page 24. And, you know, we certainly stand by it. Do you have anything else that would support a finding that it was he rather than his wife? Your Honor, we have only the statements of Mr. Madriaga regarding what occurred after Nadine went upstairs. There doesn't seem to be any controversy that Nadine went upstairs. It's only after Nadine gets upstairs that we have statements about what occurred downstairs. And it was not irrational for the jury to even rejected the fact that Madriaga never left the room, leaving a 15-month-old toddler who's making messes alone with a 2-year-old and a 4-year-old. They could have rejected that altogether and believed he remained with those children because the only one who's telling us what occurred downstairs is Madriaga. And he is making furtive statements trying to exculpate himself. I don't know what happened. I went into the gym leaving my, this 15-year-old toddler who's active in the care of a 4-year-old. They could have rejected that as not credible. Furthermore, the whole time frame. Okay, let's say they do, but simply rejecting his testimony as not credible is not proof that he did it. But he was the only one left with the child at that point. That's the evidence before the jury is that he was left to take care of Coral. And then at some point, Nadine comes downstairs and makes a 911 phone call. Now, even if you accept the fact that Madriaga was out of the room, it's only for a period of like three minutes. And the jury would have to believe, and this court believed, that Nadine came downstairs for whatever reason, violently shook this child, went back upstairs and then was coming down the stairs when Madriaga came back in and met the child at the same time. And that's the cornerstone of the defense. That's the cornerstone of the federal district court's opinion. And that cornerstone falls apart because the jury had the opportunity to consider that and rejected it. They found that it was sufficient for this triggering event, as Judge Jones has already pointed out, was sufficient. And they could have believed, or they did believe, that Madriaga is the one that violently shook Coral. Well, she was in his sole care and custody, and Nadine was upstairs. Do you want to address jurisdiction? Yes, Your Honor. At page 686 in the report and recommendation by the magistrate judge, it states the procedural posture, and that at a conference regarding the incompetency issue, it was suggested by the court that if it addressed the substantial evidence claim and reversed on that grounds, was there any need to go forward? So opposing counsel submitted authorities and a position regarding the party's issuance of report and recommendation, granting ruling on count one of the third amended petition. It was on that basis that the authorities that she supplied with that, that the court agreed that it could grant the petition based on sufficiency of the evidence without addressing the claim of IAC. The people made clear, it's not reflected in the record, but we made clear would be appealing that decision. And he said he would address it if it was remanded. So that was the decision of the parties, because we made clear at that hearing that we would be appealing it. And therefore, he decided to go forward based only on sufficiency of the evidence. And if this court would decide to reverse, then it would take up the issue. Now, if this court is still inclined to find there was no jurisdiction, I would submit it should return it, remand it back to the federal court or to the district court to address the claimant in IAC. Again, it's in the report and recommendation that was adopted at pages 686 and 687 of the excerpt of the record regarding the procedural posture. So it's apparent from the court's questions that there is a problem with this claim of finding insufficient evidence. That's been the people's position all along, and that the district court was in error in finding that the state had to present affirmative evidence. It's contrary to the authorities I cited at the beginning of my argument that there must be affirmative evidence, that they have to rule out all possible hypotheses. It's contrary to this court's decision in Sarasota v. Porter. In that case, this court found that the state court did not even take into consideration certain evidence. Incorrectly took into consideration other evidence, and then when it took into consideration the entirety of the record, it found that there was substantial evidence, or there was not objectively unreasonable for the state appellate court in that decision to uphold its decision based on sufficiency of the evidence. And by the way, they did state that it was objectively unreasonable at that point. So the fact that one consideration, the fact that Nadine Madriaga was in the home at the same time that Madriaga was, is not sufficient to establish that the state appellate court's determination was objectively unreasonable, and I'm fumbling with this so I can give you the cite to Sarasota. It's at 479 Fed 3rd at pages 681 to 683. Okay, thank you. It's in that. Case decided, stand submitted. We're adjourned. Court is adjourned.
judges: Kozinski, McKeown, Jones